UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | **CRIMINAL NO.** |
| ) | |
| v. ) | **VIOLATIONS: 18 U.S.C. § 1031(a)** |
| ) | **(Major Fraud Against the United States)** |
| ) | **and § 2 (Aiding and Abetting)** |
| **KENNETH O. COATES,** ) | |
| ) | |
| **Defendant.** ) | |

## INFORMATION

The United States of America hereby charges that:

At all times material to this Information, unless specific dates are otherwise noted:

### *Relevant Entities, Contracts and Subcontracts*

1. The United States Army Intelligence and Security Command ("INSCOM") was a United States government agency headquartered at Fort Belvoir in Fairfax, Virginia. Among its other duties, INSCOM delivered linguist support to United States Army components.

2. On or about September 7, 2007, INSCOM awarded contract W911W4-07-D-0010 ("Contract") to a government contractor headquartered in Ohio ("Prime Contractor"). The purpose of the Contract was to supply qualified linguists to serve in support of United States military operations in Afghanistan. The initial value of the Contract was approximately $703,000,000.

3. Subcontractor #1 was a private company headquartered in Arlington, Virginia which provided professional services to the federal government, including in the area of language services.

4. In or about February 2008, the Prime Contractor awarded subcontract MEP-08-0001 to Subcontractor #1. The subcontract was to identify and recruit qualified linguists that were proficient in the Dari and Pashto languages, as well as English, for work on the Contract.

5. Subcontractor #2 was a private company headquartered in Ohio. It provided consulting and assessments for oral and written language skills for both government agencies and private companies.

6. In or about February 2008, the Prime Contractor awarded a subcontract to Subcontractor #2 to administer independent language tests to the linguist candidates identified by Subcontractor #1. This independent testing was conducted during short telephone interviews, known as Oral Proficiency Interviews ("OPIs"), to ensure that linguist candidates identified by Subcontractor #1 met minimum proficiency standards in Dari and Pashto, as well as English, for work on the Contract.

### *The Recruitment Process under the Subcontracts*

7. Subcontractor #1 employed recruiters to identify and recruit qualified linguist candidates for positions on the Contract.

8. During the recruiting process, Subcontractor #1 recruiters collected personal information from linguist candidates—generally the candidate's name, phone number, street address, email address, social security number, and date of birth—and provided this information to the Prime Contractor and Subcontractor #2, which used this information to verify the identity of linguist candidates during the OPI tests.

9. The OPI test was based on correct answers on a scale of 1 to 5. A score of 3 to 5 was a passing score, and a score of 2 or less was a failed test.

10. Subcontractor #1 sent linguist candidates that met the minimum proficiency standards on the OPI test to the Prime Contractor's Pre-Deployment Processing Center ("PDPC") in Linthicum, Maryland, where the candidates underwent additional testing and training before their deployment to Afghanistan. Usually, the cost of sending a candidate to PDPC included air

fare and per diem and would be included in the invoice submitted by Subcontractor #1 to the Prime Contractor, and later billed by the Prime Contractor to INSCOM.

11.     Subcontractor #1 linguist recruiters were paid a base salary by Subcontractor #1, and could achieve bonuses of between $250 and $2,500 based on how far through a multi-step vetting process, which included PDPC, their linguist candidates progressed ("Recruiting Bonuses"). Recruiter supervisors also received bonuses for the candidates their recruiters successfully moved along the acceptance process. The Recruiting Bonuses were reimbursable under the Contract.

12.     In or about the spring of 2012, the Prime Contractor became aware that surrogates might have taken OPIs for certain candidates. At that time, the Prime Contractor retested and terminated a number of candidates who had passed through the recruiting and deployment process.

### *Coates and his Co-Schemers*

13.     Defendant Coates was employed as a regional recruiting manager by Subcontractor #1 from in or about March 2010 through in or about June 2012. He was based at the Subcontractor #1 office in Arlington, Virginia. He oversaw the other two managers, including "Manager #1," who worked in the Arlington office, as well as a team of Subcontractor #1 recruiters, all of them based at the Arlington office.

14.     The recruiters on Coates' team included, among others, Abdul Aman, and Recruiters 1-3 (individually "R-1," "R-2", and "R-3").

15.     Coates, along with his co-schemers, committed all of the acts discussed in this Information within the scope of his employment by Subcontractor #1 and for the benefit of Subcontractor #1.

## COUNT ONE
## Major Fraud Against the United States
## (18 U.S.C. §§ 1031(a) and 2)

16. Paragraphs 1-15 of this Criminal Information are re-alleged and incorporated by reference as if set out in full.

### *Scheme and Artifice*

17. From in or about January 2011 to in or about May 2012, in the District of Columbia and elsewhere, Coates and his co-schemers, including Manager #1, Aman, Recruiters 1-3, and others, knowingly executed and attempted to execute a scheme and artifice with the intent: (a) to defraud the United States; and (b) to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### *Purpose of the Scheme and Artifice*

18. The purposes of the scheme and artifice were for Coates and his co-schemers to fraudulently earn bonuses for themselves and their employers by providing false information regarding prospective linguist candidates for the Contract, and to conceal the scheme and artifice.

### *Manner and Means of the Scheme and Artifice*

19. The manner and means by which the Coates and his co-schemers sought to, and did, achieve the purpose of the scheme and artifice included the following:

    a. Coates and his co-schemers would knowingly recruit linguist candidates from around the United States that did not meet the minimum language proficiency standards in Dari, Pashto and/or English under the Contract;

    b. Coates' co-schemers would have a surrogate, usually a third-party, but in some cases themselves ("fraudulent test taker"), take OPI tests on behalf of linguist candidates that did not meet the minimum language proficiency standards;

      c.    To enable the fraudulent test takers to impersonate candidates during OPI tests, Coates' co-schemers would supply the fraudulent test takers with candidates' biographical information as well as the date and time of candidates' OPI tests;

      d.    Coates and his co-schemers would provide the Prime Contractor with the fraudulent test takers' telephone numbers in place of the linguist candidates' telephone numbers;

      e.    When Subcontractor #2 testers would call the telephone number provided for a linguist candidate to administer the OPI test, the fraudulent test taker would use the linguist candidate's personal information to impersonate the candidate and pass the OPI test;

      f.    The linguist candidate (for whom the fraudulent test taker had passed an OPI test) would be sent to PDPC in Linthicum, Maryland, for additional language testing and training for potential deployment to Afghanistan, with expenses for the travel to Maryland being a reimbursed expense by INSCOM under the Contract;

      g.    Coates and his co-schemers received Recruiting Bonuses from Subcontractor #1 based on linguist candidates that were hired because of falsified OPI tests.

      h.    Subcontractor #1's upper management put a great deal of pressure on the recruiting department to recruit and hire candidates by, among other things, crediting the number of candidates recruited and ones who reached Afghanistan, but not negatively crediting the number of candidates who failed in the testing process, and by notifying recruiters that their employment with Subcontractor #1 might be terminated if they did not produce positive results.

### *Execution of the Scheme and Artifice*

20.    Between in or about January 2011 and in or about May 2012, within the District of Columbia and elsewhere, Coates and his co-schemers did knowingly execute and attempt to execute that scheme and artifice as described above, with the intent to defraud the United States,

and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, to wit: by allowing his recruiters to cheat on the OPI tests on behalf of linguist candidates, some of whom were deployed to Afghanistan alongside United States military personnel.

All in violation of Title 18, United States Code, Sections 1031(a) and 2.

Respectfully submitted,

ROBERT A. ZINK
Chief, Fraud Section
Criminal Division
United States Department of Justice

By: *Daniel P. Butler*

Michael P. McCarthy, D.C. Bar #1020231
Daniel P. Butler, D.C. Bar # 417718
Trial Attorneys, Fraud Section
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W.
Bond Building, Fourth Floor
Washington, D.C. 20530
(202) 305-3995 (McCarthy)
Michael.McCarthy2@usdoj.gov
(202) 307-2184 (Butler)
Daniel.Butler2@usdoj.gov