UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 1:20-cr-00064-CKK |
|---|---|---|
| | ) | |
| v. | ) | VIOLATIONS: 18 U.S.C. § 1031(a) |
| | ) | (Major Fraud Against the United States) |
| KENNETH O. COATES, | ) | and § 2 (Aiding and Abetting) |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF THE OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States, by and through its undersigned attorneys, and Kenneth O. Coates ("Coates"), with the concurrence of his attorney, Nathan I. Silver, stipulate and agree that the following facts fairly and accurately describe Coates' conduct in the offense to which he is pleading guilty. These facts do not constitute all of the facts known to the parties concerning the charged offense and related conduct. This statement is being submitted to demonstrate that sufficient facts exist to establish that Coates committed the offense to which he is pleading guilty. Coates knowingly, voluntarily, and truthfully admits to the facts set forth below.

*Relevant Entities, Contracts and Subcontracts*

1. The United States Army Intelligence and Security Command ("INSCOM") was a United States government agency headquartered at Fort Belvoir in Fairfax County, Virginia. Among its other duties, INSCOM delivered linguist support to United States Army components.

2. On or about September 7, 2007, INSCOM awarded contract W911W4-07-D-0010 ("Contract") to a government contractor headquartered in Ohio ("Prime Contractor"). The purpose of the Contract was to supply qualified linguists to serve in support of United States military operations in Afghanistan. The initial value of the Contract was approximately $703,000,000.

3. Subcontractor #1 was a private company headquartered in Arlington, Virginia which provided professional services to the federal government, including in the area of language services.

4. In or about February 2008, the Prime Contractor awarded subcontract MEP-08-0001 to Subcontractor #1. The subcontract was to identify and recruit qualified linguists that were proficient in the Dari and Pashto languages, as well as English, for work on the Contract.

5. Subcontractor #2 was a private company headquartered in Ohio. It provided consulting and assessments for oral and written language skills for both government agencies and private companies.

6. In or about February 2008, the Prime Contractor awarded a subcontract to Subcontractor #2 to administer independent language tests to the linguist candidates identified by Subcontractor #1. This independent testing was conducted during short telephone interviews, known as Oral Proficiency Interviews ("OPIs"), to ensure that linguist candidates identified by Subcontractor #1 met minimum proficiency standards in Dari and Pashto, as well as English, for work on the Contract.

*The Recruitment Process under the Subcontracts*

7. Subcontractor #1 employed recruiters to identify and recruit qualified linguist candidates for positions on the Contract.

8. During the recruiting process, Subcontractor #1 recruiters collected personal information from linguist candidates they identified from around the United States—generally the candidate's name, phone number, street address, email address, social security number, and date of birth—and provided this information to the Prime Contractor and Subcontractor #2, which used this information to verify the identity of linguist candidates during the OPI tests.

9. The OPI test was scored based on correct answers on a scale of 1 to 5. A score of 3 to 5 was a passing score, and a score of 2 or less was a failed test.

10. Subcontractor #1 sent linguist candidates that its recruiters identified and that met the minimum proficiency standards on the OPI test to the Prime Contractor's Pre-Deployment Processing Center ("PDPC") in Linthicum, Maryland, where the candidates underwent additional testing and training before their deployment to Afghanistan. Usually, the cost of sending a candidate to PDPC included air fare and per diem and would be included in invoices submitted by Subcontractor #1 to the Prime Contractor, and later billed by the Prime Contractor to INSCOM.

11. Subcontractor #1 recruiters were paid a base salary by Subcontractor #1, and could achieve bonuses of between approximately $250 and $2,500 based on how far through a multi-step process, which included PDPC, their linguist candidates progressed ("Recruiting Bonuses"). Recruiter supervisors also received bonuses for the candidates their recruiters successfully moved along the acceptance process. The Recruiting Bonuses were reimbursable under the Contract.

12. In or about the spring of 2012, the Prime Contractor became aware that surrogates might have taken OPIs for certain candidates. At that time, the Prime Contractor retested and terminated a number of candidates who had passed through the recruiting and deployment process.

### *Coates and his Co-Schemers*

13. Defendant Coates was employed as a regional recruiting manager by Subcontractor #1 from in or about March 2010 through in or about June 2012. He was based at the Subcontractor #1 office in Arlington, Virginia. He oversaw the other two managers, including "Manager #1," who worked in the Arlington office, as well as a team of Subcontractor #1 recruiters, all of them based at the Arlington office.

14. The recruiters on Coates' team included, among others, Abdul Aman ("Aman") and Recruiters 1-3 (individually "R-1," "R-2", and "R-3").

15. Coates agreed with his co-schemers, including but not limited to Manager #1, Aman, and R-1 through R-3, to commit the offense of major fraud against the United States.

16. Coates admits that he and his co-schemers committed all of the acts discussed in this Statement of Offense within the scope of his employment by Subcontractor #1 and for the benefit of Subcontractor #1.

*Scheme and Artifice*

17. From in or about January 2011 to in or about May 2012, in the District of Columbia and elsewhere, Coates and his co-schemers, including Manager #1, Aman, Recruiters 1-3, and others, knowingly executed and attempted to execute a scheme and artifice with the intent: (a) to defraud the United States; and (b) to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

18. The purposes of the scheme and artifice were for Coates and his co-schemers to fraudulently earn bonuses for themselves and their employers by providing false information regarding prospective linguist candidates for the Contract, and to conceal the scheme and artifice.

19. The manner and means by which the Coates and his co-schemers sought to, and did, achieve the purpose of the scheme and artifice included the following:

    a. Coates and his co-schemers would knowingly recruit linguist candidates from around the United States that did not meet the minimum language proficiency standards in Dari, Pashto and/or English under the Contract;

b.  Coates' co-schemers would have a surrogate, usually a third-party, but in some cases themselves ("fraudulent test taker"), take OPI tests on behalf of linguist candidates that did not meet the minimum language proficiency standards;

c.  To enable the fraudulent test takers to impersonate candidates during OPI tests, Coates' co-schemers would supply the fraudulent test takers with candidates' biographical information as well as the date and time of candidates' OPI tests;

d.  Coates and his co-schemers would provide the Prime Contractor with the fraudulent test takers' telephone numbers in place of the linguist candidates' telephone numbers;

e.  When Subcontractor #2 testers would call the telephone number provided for a linguist candidate to administer the OPI test, the fraudulent test taker would use the linguist candidate's personal information to impersonate the candidate and pass the OPI test;

f.  The linguist candidate (for whom the fraudulent test taker had passed an OPI test) would be sent to PDPC in Linthicum, Maryland, for additional language testing and training for potential deployment to Afghanistan, with expenses for the travel to Maryland being a reimbursed expense by INSCOM under the Contract;

g.  Coates and his co-schemers received Recruiting Bonuses from Subcontractor #1 based on linguist candidates that were hired because of falsified OPI tests.

h.  Subcontractor #1's upper management put a great deal of pressure on the recruiting department to recruit and hire candidates. Upper management credited the number of candidates recruited and the ones who reached Afghanistan, but did not negatively consider the number of candidates who failed. Upper management notified recruiters that their employment with Subcontractor #1 might be terminated if they did not produce positive results.

20. To accomplish the manner and means of the scheme and artifice, Coates and his co-schemers committed the following acts in execution of the scheme and artifice, among others.

21. Between in or about January 2011 and in or about February 2012, Coates repeatedly scheduled OPI tests on telephone numbers that he knew or should have known belonged to or were controlled by his recruiters. Coates, as the supervisor, submitted the phone number for the OPI to the Prime Contractor, which then provided it to Subcontractor #2. A number of candidates often failed the initial OPI on the number with an area code associated with where they lived, and then would pass on a number associated with a recruiter that did not have a connection with where the candidate lived. Further, Coates submitted numbers for the OPIs that he knew or should have known were those of the recruiter or controlled by the recruiter. These included three numbers of R-1 used for sixteen candidates, two numbers of Aman used for seventeen candidates, three numbers of R-2 used for four candidates, and one number of R-3 used for four candidates.

22. The following information has to do with Candidate #1:

    a. On or about June 9, 2011, Aman sent an email to Coates which asked: "Could you please schedule [Candidate #1] for the OPI test on 06/11/11 between 12pm-2pm. His phone number is: [Aman's number]." The telephone number listed was Aman's number and was the number used for Candidate #2's passing OPI test as well, discussed below. Coates responded that day stating: "The OPI has been requested. This is the Last Time."

    b. On or about June 11, 2011, Subcontractor #2 credited Candidate #1 with a passing test on Aman's telephone number. The Prime Contractor notified Subcontractor #1 of the result by an email.

    c. On or about October 8, 2011, Candidate #1 was hired by Subcontractor #1 as a linguist and subsequently sent to Afghanistan by the Prime Contractor.

d.   In or about late-2011, Subcontractor #1 paid bonuses to, among others, Coates ($1,500) and Aman ($2,500) relative to the hiring of Candidate #1.

23.   The following information has to do with Candidate #2:

a.   On or about July 11, 2011, R-1 sent an email to Coates stating: "Hello , can you make the opi test for [Candidate #2] on 07/12/ at 2pm his phone number is [Aman's nephew's number]." This is a telephone number associated with Aman's nephew and is a northern Virginia area code, although Candidate #2 lived in southern Virginia. Coates responded that day stating: "The OPI has been requested."

b.   On or about July 25, 2011, R-1 sent an email to Coates stating: "Hello . can you make the opi test for [Candidate #2] on 07/26/ at 10am . at this phone number [Aman's number]." This is a telephone number associated with Aman and is a northern Virginia area code. Coates responded that day stating: "The OPI has been requested."

c.   On or about July 26, 2011, Subcontractor #2 credited Candidate #2 with a passing test on Aman's telephone number. The Prime Contractor notified Subcontractor #1 of the result by an email. This is the same telephone number used for Candidate #1's passing OPI test, discussed above.

d.   On or about November 20, 2011, Candidate #2 flew from southern Virginia to Baltimore, Maryland on a ticket paid for by the Prime Contractor. On or about the following day, Candidate #2, at the PDPC, took an oral Pashto language test, but stopped it before finishing because of his lack of proficiency in that language.

24.   The following information has to do with Candidates #3 and #4:

  a. On or about November 7, 2011, R-1 sent an email to Coates asking him to set up an OPI test for Candidate #3 on a phone number with a New York City area code, although the candidate lived in the Los Angeles, California area.

  b. On or about November 21, 2011, Coates notified R-1 that Candidate #3 "failed the OPI (Pashto 2) can be retested in one month."

  c. On or about December 14, 2011, R-1 sent an email to Coates asking him to set up an OPI test for Candidate #3 on the telephone number discussed in "a" above.

  d. On or about December 22, 2011, Candidate #3 was credited with a passing OPI test on the telephone number discussed in "a" above.

  e. On or about December 9, 2011, R-1 sent an email to Coates asking him to set up an OPI test for Candidate #4 on the phone number discussed in "a" above, although the candidate lived in the San Francisco, California Bay Area.

  f. On or about December 21, 2011, Candidate #4 was credited with a passing OPI test on the telephone discussed in "a" above.

25. On or about November 21, 2011, Manager #1 notified Coates, as well as another Subcontractor #1 employee, that four recent candidates "failed language at PDPC and the comment said the audio will be reviewed for possible cheating and if they cheated and they get caught they will be disqualified." Two of the candidates were recruited by Aman and one by R-1, that is, Candidate #2, discussed above.

26. In or about late-2011, Aman notified Coates that he took OPIs for a number of candidates and had a surrogate take OPIs for a number of candidates. Coates did not report this admission of cheating in the recruitment program to his Subcontractor #1's supervisors.

27. In 2011, Coates received approximately $60,250 in Recruiting Bonuses.

28. In 2012, Coates received approximately $25,250 in Recruiting Bonuses.

All in violation of Title 18, United States Code, Sections 1031(a) and 2.

    Respectfully submitted,

    ROBERT A. ZINK
    Chief, Fraud Section
    Criminal Division
    United States Department of Justice

By: /s/ Daniel P. Butler
    Michael P. McCarthy, D.C. Bar #1020231
    Daniel P. Butler, D.C. Bar # 417718
    Trial Attorneys, Fraud Section
    Criminal Division
    United States Department of Justice
    1400 New York Avenue, N.W.
    Bond Building, Fourth Floor
    Washington, D.C. 20530
    (202) 305-3995 (McCarthy)
    Michael.McCarthy2@usdoj.gov
    (202) 307-2184 (Butler)
    Daniel.Butler2@usdoj.gov

//
//
//
//
//
//
//
//
//

## DEFENDANT'S ACCEPTANCE

The preceding Statement of the Offense is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

I have read every word of this Statement of the Offense or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 3/4/2020

Kenneth O. Coates
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it fully with my client. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: Mar. 4, 2020

Nathan I. Silver, Esq.
Counsel for defendant Kenneth O. Coates